| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 4:10-CR-189(10) |
| | § | |
| MANUEL RENTERIA | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Manuel Renteria's ("Renteria") Emergency Motion for Modification of Sentence (#690), wherein he requests that the court modify his sentence of imprisonment to time served pursuant to 18 U.S.C. § 3582(c)(1)(A) due to the threat of Coronavirus Disease 2019 ("COVID-19"). The Government filed a response in opposition to the motion (#694). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.  Background

On August 1, 2012, Renteria pleaded guilty pursuant to a binding plea agreement to Count 1 of the First Superseding Indictment that charged him with Conspiracy to Possess With Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846. On August 12, 2013, the court sentenced Renteria to 178 months' imprisonment, followed by a 5-year term of supervised release. Subsequently, upon Renteria's motion, the court reduced his sentence to 143 months' imprisonment, followed by the same term of supervised release, pursuant to 18 U.S.C. § 3582(c)(2). Renteria is currently housed at the low security Federal Correctional Institution

Forrest City, located in Forrest City, Arkansas ("FCI Forrest City Low").  His projected release date is October 15, 2022.

II.     Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release.  *See United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *1 (5th Cir. Sept. 3, 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP).  The First Step Act amended § 3582(c)

by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 2020 WL 5249369, at *1 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 2020 WL 5249369, at *1 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court. Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, No. 20-5000, 2020 WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States*

*v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Although Renteria asserts in his motion that he had not exhausted his administrative remedies and that such requirement should be waived, Probation's investigation revealed that Renteria submitted a request for compassionate release based on COVID-19, dated July 1, 2020, to Warden DeWayne Hendrix of FCI Forrest City Low. On August 26, 2020, the warden denied his request, stating, "Your circumstances do not meet the criteria for consideration for a RIS [reduction in sentence] under this category." The Government concedes that Renteria met the exhaustion requirement. Although Renteria exhausted his administrative remedies before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii)

4

the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

In the instant motion, Renteria, age 46, contends that he is eligible for compassionate release due to his medical conditions, asserting that he suffers from high blood pressure, obesity, and chronic bronchitis. The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

In Renteria's Presentence Investigation Report ("PSR"), prepared in February 2013, Probation noted that Renteria "indicated he is in good health and free of any maladies or ailments." Renteria made no mention of having high blood pressure or chronic bronchitis. According to his PSR, Renteria measured 5 feet 10 inches tall and weighed 270 pounds, giving him a body mass index ("BMI") of 38.7, well above 30, the threshold for obesity. In a declaration submitted on Renteria's behalf, Lora Renteria, his ex-wife, claims that Renteria is "clinically obese" and "suffers from chronic bronchitis and other severe medical conditions." Other than this bare assertion, Renteria offers no support for his claimed medical problems.

Renteria's BOP medical records, provided by the Government, contain no references to diagnoses for high blood pressure or chronic bronchitis. Further, Probation's investigation revealed that Renteria is classified by the BOP as a Care Level 1 inmate, indicating that he is "less than 70 years of age and [is] generally healthy." According to his medical records, on February 6, 2020, Renteria's blood pressure reading was 119/77, a normal blood pressure. In addition, it is unclear whether Renteria remains obese, as he reported to the medical provider on February 6, 2020, "I have lost a lot of weight." On May 29, 2020, at Renteria's general medical examination, the medical staff noted that there were no "abnormal findings" and that Renteria was not prescribed any medications.

On May 6, 2020, Renteria tested positive for COVID-19 and was placed in isolation. Renteria's BOP medical records confirm that on June 10, 2020, following 14 days of quarantine, Renteria was released from isolation. Although Renteria and his ex-wife claim that he experienced "severe headaches, muscle aches, and tightness in his chest," Probation's investigation revealed, and BOP medical records confirm, that Renteria had an asymptomatic case of the disease.

According to Renteria's medical records, he informed medical staff during COVID-19 screenings occurring between May 5, 2020, and June 21, 2020, that he did not experience any cough, shortness of breath, muscle pain, fatigue, sore throat, headache, new loss of taste and smell, or chills.  Even if Renteria suffered from more severe complications from COVID-19, or if he had chronic bronchitis, obesity, and high blood pressure, his medical conditions do not meet the criteria listed above.  None of these medical conditions is terminal or substantially diminishes his ability to provide self-care.  Moreover, any health problems he experienced did not hamper or prevent him from engaging in large scale narcotics trafficking during the term of the conspiracy.  Accordingly, Renteria has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence.  In any event, "compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)."  *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  Where, as here, the defendant has engaged in "severe" criminal conduct, the district court has discretion to deny compassionate release after weighing the evidence.  *Id.* at 693-94.

      Renteria's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 cmt. n.1(D).  Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present.  *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of

7

the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Renteria for any "other" reason. In exercising its discretion, the court, likewise, finds that no extraordinary and compelling reasons exist in relation to Renteria's situation. Renteria maintains that if he contracts COVID-19 a second time it will be fatal for him due to prison overcrowding and there being no way to distance himself from other inmates. Renteria also raises concerns regarding the spread of COVID-19 among the prison population. His motion contains a chart in which cases of COVID-19 within the BOP are analyzed, yielding an infection rate of 1.04% of the prison population. This is well below the 3.1861% infection rate reported on October 1, 2020, for Dallas County, Texas, where Renteria proposes to live under his release plan. Nevertheless, as of October 1, 2020, the figures available at www.bop.gov list 2 inmates (out of a total inmate population of 1,745) and 10 staff members at FCI Forrest City Low as having confirmed positive cases of COVID-19, 651 inmates and 4 staff members who have recovered, and no inmates who have succumbed to the disease at the facility.

Indeed, according to Renteria's medical records, he tested positive for the disease. Probation's investigation, supported by Renteria's BOP medical records, reveals that he was an asymptomatic patient and has since recovered and been released from medical isolation. Thus, it appears that the facility where Renteria is housed is handling the outbreak appropriately and providing adequate medical care. Courts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who have already contracted and recovered from the virus. *See*, *e.g.*, *United States v. Stockman*, No. H-17-116-2, 2020 WL 5269756, at *3 (S.D. Tex. Aug. 26, 2020) (noting that when an inmate is infected and recovers from COVID-19, the courts have found the risks of infection or severe symptoms or effects because of underlying conditions change and diminish); *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) ("Courts have denied COVID-19-based motions for compassionate release filed by inmates who have already contracted the virus."); *United States v. Neal*, No. CR 11-28, 2020 WL 4334792, at *1 (E.D. La. July 28, 2020) ("Courts have repeatedly found that defendants who contract COVID-19 and recover are not among those who fall within the guidelines or demonstrate 'extraordinary and compelling reasons,' meriting a reduction in their sentence."); *United States v. Gallegos*, No. 4:17-CR-568, 2020 WL 3403032, at *3 (S.D. Tex. June 19, 2020) ("Having already contracted and fully recovered from COVID-19, the Court cannot say that Defendant's asthma 'substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility.'" (quoting U.S.S.G. § 1B1.13)).

Although Renteria expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Renteria, if he were to contract the virus once again and

develop COVID-19 symptoms, while incarcerated. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Renteria has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to reduce sentence to time served and release him from prison.

The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the

§ 3553(a) factors before granting compassionate release); *Chambliss*, 948 F.3d at 693-94. Renteria's conviction stems from his involvement as a supplier and distributor in a drug trafficking conspiracy that involved the distribution of between 50 and 150 kilograms of cocaine. Renteria supplied kilogram quantities of cocaine from various sources to co-conspirators for further distribution, utilizing a variety of stash houses. In August 2010, law enforcement received information from a cooperating source that Renteria was distributing kilogram quantities of cocaine and marijuana to the cooperating source. In a recorded phone call with the cooperating source, Renteria offered to sell the source a kilogram of cocaine, indicating that was all he had available at that time. Subsequently, law enforcement officers executed a search warrant at Renteria's residence, where they discovered 22.3 grams of cocaine base, 1.9 grams of cocaine, a .38 caliber revolver, and $4,400.00 in U.S. currency in a safe in the garage. On August 31, 2010, Renteria's estranged wife, now his ex-wife, Lora Renteria, informed law enforcement that she had received a coded message from Renteria indicating that he had stored contraband in her basement. Officers discovered approximately 82.17 kilograms of marijuana, 299.7 grams of cocaine, four homemade kilo presses, and a large amount of handgun and rifle ammunition in her basement. According to the PSR, Renteria was responsible for the distribution of marijuana, cocaine, cocaine base, and likely methamphetamine. In the plea agreement, Renteria agreed to forfeit a firearm, 6 vehicles, 2 water craft, a trailer, and currency, as well as the land, residence, and improvements where he lived. He also agreed to forfeit $2 million in currency and all interest and proceeds traceable thereto, as that sum in aggregate constituted proceeds of his drug trafficking activities.

Moreover, Renteria's disregard for the law did not end at the prison gate. On August 16, 2020, while incarcerated, the BOP sanctioned Renteria for possessing a hazardous tool (cell phone). Because of this incident, Renteria lost 41 days of good conduct time and 180 days of commissary access, email privileges, and family visitation. Further, Renteria has a history of alcohol abuse. While he reported drinking only socially to Probation, his PSR indicates that his ex-wife reported that he "drank daily, both hard liquor and beer" and that "she suspected that once released from custody he would resume drinking." In view of the nature and circumstances surrounding his offense of conviction, the court cannot conclude that Renteria would not pose a danger to any other person or to the community, if released from prison. Clearly, Lora Renteria, his ex-wife with whom he wants to reside upon release, would not be a suitable custodian, as she was unaware of the significant quantities of drugs and other contraband stored in her basement and has conceded that Renteria will likely resume drinking heavily upon his release. In this situation, as confirmed by his past history, the court cannot depend on his ex-wife to keep Renteria's conduct in check.

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically

by case management staff. To date, the BOP has placed 7,745 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020). The BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Ambriz v. United States*, No. 4:20-CV-568-P, 2020 WL 3066861, at *2 (N.D. Tex. June 5, 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement.").

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020)). Here, there is no reason to believe that Renteria would not revert to his drug-dealing and drug-abusing activities if released from prison at this time.

In short, Renteria has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 2020 WL 1940570, at *4-5 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 2020 WL 1940570, at *5.

III.   Conclusion

Consistent with the foregoing analysis, Renteria's Emergency Motion for Modification of Sentence (#690) is DENIED.

SIGNED at Beaumont, Texas, this 2nd day of October, 2020.

                                                                    _____
                                                                    MARCIA A. CRONE
                                                                    UNITED STATES DISTRICT JUDGE